CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUL 20 2018

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| LLOYD S., | ) | |
| Plaintiff, | ) | Civil Action No. 4:17-cv-00026 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| NANCY A. BERRYHILL, | ) | By:  Joel C. Hoppe |
| Acting Commissioner | ) | United States Magistrate Judge |
| of Social Security, | ) | |
| Defendant. | ) | |

Plaintiff Lloyd S. asks this Court to review the Acting Commissioner of Social Security's

("Commissioner") final decision denying his applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the administrative record, the parties'

briefs and oral arguments, and the applicable law, I find that substantial evidence supports the

Commissioner's final decision. Therefore, I recommend that the Court deny the Plaintiff's

Motion for Summary Judgment, ECF No. 17, grant the Commissioner's Motion for Summary

Judgment, ECF No. 21, and affirm the Commissioner's final decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

1

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration

requirement; (3) has an impairment that meets or equals an impairment listed in the Act's

regulations; (4) can return to his or her past relevant work based on his or her residual functional

capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*,

858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not

disabled. *See id.*

## II. Procedural History

Lloyd S. filed his current DIB application on August 2, 2012, Administrative Record

("R.") 109, ECF No. 9-1, and his SSI application on August 17, 2012, R. 123. In both

applications, Lloyd S. alleged onset of disability as August 2, 2008, caused by fractures in his

legs and missing ligaments in his right ankle. R. 109, 123. Disability Determination Services

("DDS"), the state agency, denied his claims at the initial, R. 109–22, 123–37, and

reconsideration stages, R. 140–55, 156–71. On December 9, 2015, Lloyd S. appeared with

counsel and testified about his impairments and functional limitations at an administrative

hearing before ALJ R. Neely Owen. R. 49–72. The ALJ also heard testimony from a vocational

expert ("VE") regarding the availability of other jobs in the national and local economies, R. 72–

77. At the administrative hearing, Lloyd S. moved to amend his alleged disability onset date to

February 23, 2011, R. 55–56, which ALJ Owen granted, R. 25–26.

On February 29, 2016, ALJ Owen denied Lloyd S.'s claims in a written decision. R. 25–

42. The ALJ found that Lloyd S.'s date last insured ("DLI")[1] was December 31, 2011, and that

---

[1] To qualify for DIB, Lloyd S. "must prove that []he became disabled prior to the expiration of [his]
insured status." *Johnson*, 434 F.3d at 656; *see* 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131
(2015). The date last insured is not relevant to his SSI claim. *See Redditt v. Colvin*, No. 7:13cv391, 2014
WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501 (2015).

he had not engaged in substantial gainful activity since the alleged onset of disability. R. 28. ALJ Owen concluded that Lloyd S. had severe impairments of dysfunction of the left ankle joint, discogenic/degenerative back disorder, and minor motor seizures. R. 28–29. He deemed Lloyd S.'s anxiety non-severe. *Id.* The ALJ next determined that none of Lloyd S.'s severe impairments, either alone or in combination, met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 29–30.

As to Lloyd S.'s residual functional capacity ("RFC"),[2] the ALJ found that he could perform "a range of light work"[3] as defined in the regulations, except that he could stand and/or walk for a total of four hours; occasionally operate foot controls with both feet; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and never climb ladders, ropes, or scaffolds. R. 30; *see also* R. 30–40. Additionally, Lloyd S. would need to avoid concentrated exposure to vibration and avoid all exposure to hazards. R. 30. Based on this RFC and the VE's testimony, the ALJ found that Lloyd S. could not perform any of his past relevant work, but he could perform certain occupations existing in significant numbers in the national and local economies including cashier, sorter, and non-governmental mail clerk. R. 40–42. The ALJ thus determined that Lloyd S. was not disabled. R. 42. The Appeals Council denied Lloyd S.'s request for review, R. 1–3, and this appeal followed.

## III. Background

*A.    Relevant Medical Evidence*

---

[2] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[3] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990).

1.    *Bilateral Ankles*

Prior to the amended alleged onset date, Lloyd S. complained of instability in both

ankles. An MRI of the right ankle taken on April 23, 2010, revealed a small tear in the anterior

talofibular ligament with lateral instability. R. 352–53. The plan was for Lloyd S. to be

scheduled for right ankle arthroscopy and surgical repair of the anterior tablofibular ligament, R.

353, but Lloyd S. later told consultative examiner William Humphries, M.D., that he had "not

undergone surgery or injection[s] into the right ankle," R. 499 (June 2013). On May 4, Randolph

Clements, D.P.M., performed a left ankle scope with modified brostrom. R. 347, 356–57. Lloyd

S. followed up with Dr. Clements on July 28 and reported that his ankle felt better than it did

pre-surgery. R. 366. Dr. Clements gave Lloyd S. a second ankle brace to wear on the right in

addition to the one he already used on the left and recommended that he discontinue using his

cane. R. 366–67.

After the alleged onset date, Lloyd S.'s various providers, including Dr. Humphries,

Mark Mahoney, D.O., Trevar Chapman, M.D., Shubha Chumble, M.D., Patrick Favero, D.O.,

Edgar Weaver, M.D., and Julia Hodnett, F.N.P., documented Lloyd S.'s comments related to his

ankle impairments. Lloyd S. initially reported to Dr. Mahoney on April 26, 2011, that his left

ankle felt "85% better" than it did before surgery, R. 417, but he continued to report some pain

throughout the relevant period, *see, e.g.*, R. 426 (general complaint of joint pain on October 16,

2011); R. 589 (complaint of various symptoms in legs on August 19, 2014, to Dr. Weaver); R.

536, 539 (reports of left ankle pain on December 9, 2014, and September 16, 2015, to FNP

Hodnett). Lloyd S.'s report of symptoms related to his ankles varied. *Compare* R. 387

(intermittent numbness on entire left side and "some burning pain" in bilateral ankles on March

31, 2011); R. 499 ("severe problems with pain and give-way in ankle region" during consultative

examination on June 20, 2013); R. 514 (uncontrolled severe chronic leg pain on August 19, 2013), *with* R. 417 ("moderate" symptoms on April 26, 2011); R. 415 ("improving" foot pain on June 3, 2011); R. 423 (foot numbness, but no gait instability, on March 7, 2012); R. 466, 471 (moderate and controlled ankle pain on April 6 and June 29, 2012), *and* R. 421, 461, 530 (no relevant complaints on July 14, 2011, March 6, 2013, or May 14, 2014). Most physical examinations recorded did not address findings relevant to Lloyd S.'s ankles, but when they did, the examinations were often unremarkable with observations of normal gait, R. 397, 424, 472, 531, 534, 537, 540, full strength and motor function, R. 501, and no extremity edema, R. 377, 415, 417, 462, 515, 531, 534, 537, 540. On occasion, examinations revealed mildly antalgic gait on the left, but adequate tandem gait, R. 501, some extremity edema, R. 441, decreased range of motion in the ankles, R. 377, 498 (bilateral); R. 426 (left, "secondary to fusion"), and pain with palpation, R. 426, or range of motion, R. 417. Post-operative treatment was limited to adjustments of various medications, including oxycodone, R. 418; hydrocodone, R. 415, 422; Cymbalta, R. 427; Lortab, R. 424, 472; and Percocet, R. 472. Lloyd S. noted that these medications helped alleviate his pain. *See* R. 466, 471, 514.

Additionally, an electromyogram and nerve conduction study ("EMG/NCS") conducted on March 31, 2011, resulted in a relatively normal study. R. 390. An X-ray of the right ankle on June 20, 2013, showed "mild osteoarthritic changes of the tibiotalar joint" and intact joint space. R. 495.

### 2.    *Other Impairments*

Lloyd S. also reported pain in his shoulders, left arm, neck, upper back, and lower back, as well as multiple syncopal episodes. *See, e.g.*, R. 396, 423, 463, 466, 469, 533, 588. An MRI of his cervical spine on July 17, 2012, revealed small central disc protrusions at C5-6 and C6-7, but

6

no foraminal narrowing or compromise of the spinal cord. R. 458. Relevant findings on physical examination varied. For example, Lloyd S. had full range of motion in the neck on July 22, 2011, when examined by Dr. Chumble, R. 397, but Dr. Mahoney observed some decreased range of motion on August 30, 2012, R. 464, as did Dr. Humphries during the consultative examination on June 20, 2013, R. 498. FNP Hodnett also observed decreased range of motion in the neck on July 18, 2014. R. 534. As to his lower back pain, Dr. Humphries recorded slightly diminished range of motion in the thoracolumbar spine and a negative straight leg raise test. R. 498, 500. Strength, range of motion, and sensation of the left shoulder were normal with no tenderness to palpation on May 16, 2012, R. 470, but at a subsequent visit on June 29, Dr. Mahoney observed tenderness and decreased strength and range of motion, R. 467. On August 19, 2014, Dr. Weaver noted possible "very slight atrophy of the left biceps" and explained that Lloyd S.'s "clinical presentation [was] not at all congruent with a monoradiculopathy, cervical nor myelopathy." R. 589. Dr. Weaver did "not see any significant evidence to consider surgery at the present time." *Id.* FNP Hodnett observed 4/5 motor strength in the bilateral upper extremities in 2014 and 2015. R. 534, 537, 540. Treatment was limited to medications—including Lortab, R. 462; Percocet, R. 463, 469; Celebrex, R. 463, 468; and Lyrica, R. 534, 537, 541—and injections, R. 468, 470, 534. Although Lloyd S. reported that the injections did not help, R. 466, 571, he occasionally reported symptom improvement from his medications, R. 463, 514, 571. Lloyd S. also treated with various providers after experiencing several syncopal episodes, but all related tests were normal. *See* R. 396–98, 423–25, 485–86. In July 2011, Dr. Chumble ruled out neurologic causes of syncope and attributed Lloyd S.'s episodes to low blood pressure and a new medication. In April 2012, Benjamin Lee, M.D., attributed Lloyd S.'s syncope to gastrointestinal issues. R. 485–86.

B.     *Opinion Evidence*

1.    *Treating Sources*

The record contains opinions from three of Lloyd S.'s treating sources. On November 24, 2010, Dr. Mahoney completed a physical RFC form. R. 606. Dr. Mahoney opined that Lloyd S. could stand/walk for thirty minutes and sit in a work posture for thirty minutes during an eight-hour workday. *Id.* He could lift and/or carry ten pounds frequently and five pounds occasionally. *Id.* He could use his hands for simple grasping and fine manipulation, but not for pushing and pulling or repetitive motion. *Id.* His pain would cause frequent interruptions in concentration and focus, and he would have days where he would be unable to work because of pain. *Id.* He would also need opportunities to elevate his lower extremities and take breaks to lie down and rest during an eight-hour workday. *Id.* Lloyd S. needed ankle braces for both ankles, and Dr. Mahoney considered his complaints of pain genuine. *Id.*

Dr. Clements completed the same RFC form on December 10, 2010. R. 381. Dr. Clements opined that Lloyd S. could stand/walk for two hours and sit for four hours during an eight-hour workday. *Id.* He could lift and/or carry up to ten pounds. *Id.* He could use his hands for simple grasping and fine manipulation, but not for pushing and pulling or repetitive motion. *Id.* He needed bilateral ankle braces and opportunities to elevate his lower extremities during an eight-hour workday as well. *Id.* Dr. Clements noted that he was "not able to determine at this point" whether Lloyd S.'s complaints of pain were genuine. *Id.* He explained that if Lloyd S.'s complaints of pain were accurate, he would experience frequent interruptions in concentration and focus. *Id.* Lloyd S. told Dr. Clements that he required opportunities to rest during the workday. *Id.* Dr. Clements noted that it was possible there would be days where Lloyd S. was unable to work because of exacerbations in his pain. *Id.*

FNP Hodnett also completed a more detailed RFC form on November 6, 2015. R. 602–05. She opined that Lloyd S. could lift and/or carry ten pounds occasionally and less than ten pounds frequently. R. 602. He could stand and/or walk less than two hours and sit for less than two hours during an eight-hour workday. R. 602–03. He needed a four-pronged cane to ambulate, as well as the opportunity to periodically alternate between sitting and standing. *Id.* He further needed to rest, by lying down or reclining, for a total of six hours during the eight-hour workday to relieve impairment-related pain and fatigue. R. 603. His ability to push and/or pull was not affected. *Id.* FNP Hodnett explained these limitations were based on Lloyd S.'s history of left ankle surgery, herniated discs, and spondylitic changes of the cervical and lumbar spine. *Id.* Lloyd S. could occasionally balance, but could never kneel, crouch, crawl, stoop, or climb because of his chronic back and neck pain, as demonstrated by limited range of motion in his lumbar and cervical spine and need to walk with a cane. R. 604. He was limited to using his hands for gross manipulation occasionally and his fingers for fine manipulation frequently because of tremors. *Id.* On that day's examination, however, FNP Hodnett did not observe any fine tremors, and range of motion and strength were within defined limits. *Id.* Lloyd S.'s impairments would cause him to be absent from work more than three times per month, and they had existed since at least August 2, 2008. R. 605.

2.    *DDS Examiners*

On June 25, 2013, Tony Constant, M.D., evaluated Lloyd S.'s functioning as part of the initial state agency review of his applications. R. 110–20, 124–35. Dr. Constant opined that Lloyd S. could lift and carry twenty pounds occasionally and ten pounds frequently; could stand and/or walk four hours and sit about six hours during an eight-hour workday; and was limited in both lower extremities for pushing and pulling. R. 118, 133. Lloyd S. could occasionally crawl,

crouch, kneel, stoop, balance, and climb ramps and stairs, but he could never climb ladders,

ropes, or scaffolds, and he needed to avoid concentrated exposure to vibration and avoid all

exposure to workplace hazards. R. 119, 134. Dr. Constant explained that Lloyd S.'s pain in his

feet, ankles, legs, back, and neck, as well as his occasional syncopal episodes, contributed to

these limitations. R. 118–20, 133–35. On March 27, 2014, as part of the reconsideration review

of Lloyd S.'s application, Robert McGuffin, M.D., reaffirmed Dr. Constant's findings and

additionally specified that Lloyd S.'s post-DLI RFC would be limited to occasional bilateral foot

controls. R. 141–53, 157–69.

C.      *Lloyd S.'s Report of Symptoms and Testimony*

         Lloyd S. submitted one Adult Function Report, completed on February 19, 2013, as part

of his applications for benefits. R. 295–303. Lloyd S. stated that he lived in a house with his wife

and on a typical day, he took his medication, watched television, and read the newspaper. R. 295.

He did not take care of anyone else, and he struggled with personal care, including dressing,

bathing, and shaving. R. 296. He prepared simple meals such as sandwiches, Pop-tarts, soup, and

other things that were "quick." R. 297. He picked up after himself and did laundry with his wife.

*Id.* He could not do any work outside because his ankles rolled over on him. R. 297–98. He sat

outside on the porch once a week and watched the cars go by. R. 298. He did not go out alone or

drive because he was afraid of passing out. *Id.* His interests included watching sports and movies

on television, but before his impairments manifested, he enjoyed playing sports. R. 296, 299. He

had a limited social life, and his only regular activity was going to the doctor. R. 299. He had

trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs,

completing tasks, concentrating, and using his hands. R. 300. He could not lift because of his

back, arms, and legs; he could walk for twenty-five yards before needing to stop and rest for

about fifteen minutes; too much sitting aggravated his back; walking up steps was dangerous because of his ankles rolling; and his arms and hands went numb when holding a cup of coffee. R. 300, 302–03. He used a cane when walking to help with support, as well as braces for his ankles, both of which were prescribed by a doctor in 2010. R. 301.

At the administrative hearing, Lloyd S. testified that his ankles swelled every day, causing unbearable pain, and still rolled over, which was why he used ankle braces and a cane all day until he went to bed. R. 65–66. He had trouble picking things up because of constant numbness from his shoulders down to his hands on both sides, and he feared dropping things. R. 66–67. He had experienced neck pain and numbness since 2012. R. 67, 71. He also had numbness and tingling in his legs, from his ankle up to his knee, all the time. R. 68. He could stand for up to thirty minutes before his legs would give out, and he could sit for thirty minutes before getting numb and having to get up and walk around. R. 68–69. On bad days, he stayed in bed the entire day, and on other days, he got up, went to the living room, and stayed in the recliner all day. R. 69. He took medications for his pain, but they did not help. R. 70. He did not do any chores around the house because he was scared that something bad would happen. *Id.*

## IV. Discussion

Lloyd S. brings three distinct challenges to ALJ Owen's decision. First, he asserts that the ALJ did not properly assess his symptoms and alleged limitations. Pl.'s Br. 21–25, ECF No. 18. He next contends that the ALJ improperly evaluated the opinions of his treating sources—Dr. Mahoney, Dr. Clements, and FNP Hodnett. *Id.* at 14–21. Last, he lodges various challenges to the ALJ's RFC determination. In particular, he argues that a limitation to four hours of walking and standing is inconsistent with an ability to perform the full range of light work; that the ALJ erred by not including any manipulative limitations in the RFC; and that the ALJ did not

11

complete a proper function-by-function analysis because he neglected to address Lloyd S.'s alleged manipulative limitations, need to lie down during the day, and frequency of work absences. *Id.* at 25–27. These arguments are not persuasive.

A.    *Severity of Symptoms*

The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866; *see also Craig*, 76 F.3d at 594. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *see Mascio v. Colvin*, 780 F.3d 632, 636–37, 639 (4th Cir. 2015). "The second determination requires the ALJ to assess the credibility of the claimant's statements about [his] symptoms and their functional effects." *Lewis*, 858 F.3d at 866. When conducting this inquiry, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that he is disabled by pain or other symptoms caused by a medical impairment or related treatment; he cannot reject the claimant's description of his symptoms "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. §§ 404.1529(c), 416.929(c). *See Lewis*, 858 F.3d at 866; *Hines*, 453 F.3d at 565. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). The ALJ's articulated reasons for discounting a claimant's subjective complaints need only be legally adequate and supported by substantial evidence in the

record. *See Mascio*, 780 F.3d at 639; *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th

Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

      ALJ Owen's RFC finding restricted Lloyd S. to a range of light work with additional

limitations on his ability to stand and/or walk and to perform other physical functions that

typically involve the lower extremities. R. 30. At the beginning of his RFC assessment, he

accurately summarized Lloyd S.'s subjective statements describing his pain-related functional

limitations, R. 31, as well as the relevant treatment notes and other medical evidence, R. 32–40.

ALJ Owen then offered multiple reasons to support his finding that Lloyd S.'s statements about

his symptoms and limitations were "not entirely credible," R. 36, and overall, substantial

evidence supports this conclusion.[4] First, ALJ Owen explained that Lloyd S.'s "treatment record

[did] not support his allegations regarding the severity of his limitations." R. 36. The ALJ further

stated that "despite alleging significant functional limitations, repeated physical examinations

have failed to reveal significant ongoing . . . neurological deficits or decreased strength or range

of motion, as would be expected with the degree of limitation alleged." R. 37. Lloyd S. does not

dispute the ALJ's examples or this reason. ALJ Owen explained that an EMG/NCS from March

31, 2011, regarding Lloyd S.'s left foot and ankle pain and numbness was relatively normal. R.

36 (citing R. 387–95). He also identified numerous treatment notes concerning Lloyd S.'s

various physical impairments, in particular those that reflected normal or unremarkable physical

examinations on July 14 and July 22, 2011; March 7, April 6, and May 16, 2012; March 6 and

August 19, 2013; May 14 and December 9, 2014; and September 16, 2015. R. 36. The ALJ

accurately characterized these physical examinations as normal. *See* R. 397, 422, 424, 462, 469–

---

[4] I am not convinced by ALJ Owen's reference to Lloyd S.'s purportedly inconsistent statements and failure to follow recommended treatment. *See* R. 36–37. His discussion omitted important evidence and often failed to explain the relevance of the cited examples. As such, I cannot find those reasons are supported by substantial evidence.

70, 472, 515, 531, 537, 540. Moreover, medical providers consistently observed normal gait on examination. *See* R. 397, 424, 472, 531, 534, 537, 540. Thus, ALJ Owen did not err in finding that these normal findings on examination weighed against Lloyd S.'s credibility. *See Hines*, 453 F.3d at 564 n.3 ("Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." (quoting *Craig*, 76 F.3d at 595)).

Similarly, ALJ Owen stated that although Lloyd S. "appear[ed] at the hearing with a four-prong cane, the medical records do not support the necessity of this." R. 37. Lloyd S. takes issue with this reasoning because the ALJ did "not point to any evidence in support of this conclusion." Pl.'s Br. 23–24. Yet, Lloyd S. does not point to any evidence in support of his statements that he uses and/or medically requires a cane to walk. Social Security Ruling ("SSR") 96-9p requires the ALJ to consider "the impact of 'medically required' hand-held devices," such as a cane, when evaluating the individual's RFC. *Wimbush v. Astrue*, No. 4:10cv36, 2011 WL 1743153, at *2–3 (W.D. Va. May 6, 2011) (quoting SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996)). In order "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7. Here, the record contains no medical-source evidence of a prescription for a cane during the relevant period, nor does it contain any credited notations from a medical provider

14

finding that such a device was medically necessary.[5] *See Wimbush*, 2011 WL 1743153, at *3

("[E]ven if a cane is prescribed, it does not necessarily follow that it is medically required.").

Indeed, the only treatment note addressing Lloyd S.'s need to use a cane came on July 28, 2010,

when Dr. Clements expressly advised Lloyd S. to *discontinue* using his cane several months

before his amended alleged onset date. R. 367. Essentially, Lloyd S. argues that ALJ Owen's

reasoning is unsupported because the ALJ did not prove a negative—in this case, a lack of

reliable medical evidence showing that he needed the cane that he used at the administrative

hearing . But Plaintiff's argument falters because he points to no medical evidence not

considered by the ALJ to show that he in fact needed a cane to walk. *See Morgan v. Comm'r,*

*Soc. Sec.*, Civ. No. JKB-13-2088, 2014 WL 1764922, at *1 (D. Md. Apr. 30, 2014) (explaining

that the claimant bears "the burden of establishing that his use of a cane is medically necessary");

*cf. Timmons v. Colvin*, No. 3:12cv609, 2013 WL 4775131, at *9 (W.D.N.C. Sept. 5, 2013)

("Because there is no evidence showing that the cane is medically required or law requiring an

ALJ to consider the impact of a non-required device, the ALJ did not err in finding the Plaintiff

could perform light work.").

    ALJ Owen also explained that other than an initial ankle surgery—after which no further

surgery was recommended—Lloyd S.'s treatment was routine and conservative. R. 37; *see Dunn*

*v. Colvin*, 607 F. App'x 264, 273 (4th Cir. 2015) ("[I]t is appropriate for the ALJ to consider the

conservative nature of a plaintiff's treatment . . . in judging the credibility of the plaintiff."). This

treatment did not include any ongoing treatment with a specialist—such as an orthopedist,

neurologist, or pain management specialist—and contained gaps. R. 37. Lloyd S. disagrees and

---

[5] FNP Hodnett stated in her RFC opinion that Lloyd S. needed a four-pronged cane to walk. R. 602. As
discussed below, the ALJ properly explained why this opinion was unfounded, and thus it does not
change the analysis here.

asserts that the ALJ did "not point to any other treatment plaintiff should have obtained in order
to convince the ALJ that his allegations were supported." Pl.'s Br. 23.

Lloyd S.'s argument misses the point. This is not "a situation in which there is any
suggestion that [he] required more aggressive treatment yet received conservative treatment for
other reasons." *Dunn*, 607 F. App'x at 275. In this case, the doctors recommended only
conservative treatment, which was an acceptable reason for the ALJ to question Lloyd S.'s
complaints of pain. *See id.* at 274 ("It is as simple as this: if all the claimant needs is conservative
treatment, it is reasonable for an ALJ to find that the alleged disability is not as bad as the
claimant says it is.").

No doctor recommended additional surgery for any of Lloyd S.'s impairments, nor did
Lloyd S. consistently obtain treatment from a relevant specialist. Indeed, Lloyd S. concedes in
his brief that both FNP Hodnett and Dr. Mahoney, the only two providers who frequently treated
him during the relevant period, specialize in family medicine. Pl.'s Br. 20.[6] As the ALJ noted,
the record also contained multiple gaps in relevant treatment, R. 37, including a five-month gap
from October 2011 to March 2012, a six-month gap from late August 2012 to early March 2013,
a ten-month gap from August 2013 to May 2014, and a nine-month gap from December 2014 to
September 2015. *See Burke v. Berryhill*, No. 5:15cv74, 2017 WL 1133508, at *8 (W.D. Va. Mar.
24, 2017) (concluding that it was reasonable for the ALJ to determine that sporadic treatment—
once every nine months—along with normal exam findings and conservative treatment was
inconsistent with the claimant's report of severely debilitating symptoms). Additionally,
medications and injections, his primary treatment modalities during the relevant time, have

---

[6] According to Lloyd S., Dr. Clements specializes in orthopedics, Pl.'s Br. 20, and the treatment notes
indicate he is a podiatrist. Nevertheless, he did not treat Lloyd S. during the relevant period, with the last
treatment coming in July 2010. *See* R. 366–67.

properly been considered conservative for physical impairments. *See Dunn*, 607 F. App'x at 272–75; *Gregory v. Colvin*, No. 4:15cv5, 2016 WL 3072202, at *5 (W.D. Va. May 6, 2016) ("It was reasonable for the ALJ to characterize [Plaintiff's] course of treatment, consisting of pain medication . . . and steroid injections, as 'conservative.'"), *adopted by* 2016 WL 3077935 (W.D. Va. May 31, 2016).

The ALJ further noted that these medications were relatively effective and did not cause side effects. R. 36–37; *see Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). The ALJ identified at least two examples of Lloyd S.'s reports that his medications provided relief or control of pain from his physical impairments. R. 36–37 (citing R. 471 (narcotic medications controlled ankle and lower extremity pain during April 6, 2012, visit with Dr. Mahoney); R. 571 (opioids, NSAIDs, and muscle relaxants provided some improvement of pain relief during his only visit to a pain management specialist on November 24, 2014)). Other examples in the record further support the ALJ's reasoning. Lloyd S. reported mild improvement of his ankle pain with NSAIDs during a June 29, 2012, visit with Dr. Mahoney, R. 466, and although the ALJ mischaracterized the treatment note, Lloyd S. did indicate on August 19, 2013, that he benefitted from narcotics for his back and leg pain, R. 514.

Lloyd S. nonetheless attempts to distinguish some of the ALJ's examples and highlight omissions regarding the effectiveness of his medications. He contends that the ALJ did not address Dr. Mahoney's adjustment of Lloyd S.'s medication to Lortab on March 7, 2012. Pl.'s Br. 22; *see* R. 424. He asserts that although he reported controlled pain on April 6, his "pain level was still 5/10, indicating it was not 100% controlled." Pl.'s Br. 22. He challenges the ALJ's reference to a note detailing "some improvement" on November 24, 2014, because "[n]owhere in

the note does plaintiff state that his medications were controlling or eliminating his pain." *Id.* at

23. Lloyd S. also takes issue with many of the ALJ's other examples, including his reports that

Ambien helped his ankle pain at night; narcotic medications controlled his chronic back and leg

pain on August 19, 2013; and Cymbalta controlled his depression in May 2014. Pl.'s Br. 22–23.

Although ALJ Owen's discussion regarding the effectiveness of medications is not

perfect, "[i]t must be recognized that the inability to do work without any subjective discomfort

does not of itself render a claimant totally disabled." *Legg v. Astrue*, No. 5:08cv54, 2009 WL

366208, at *3 (W.D. Va. Feb. 12, 2009); *see also Green v. Astrue*, No. 3:10cv764, 2011 WL

5593148, at *4 (E.D. Va. Oct. 11, 2011) (explaining that a claimant "does not have to be pain-

free in order to be found 'not disabled,'" particularly where the ALJ finds that the claimant could

work only "at a lower exertional level" than he did before his alleged onset date) (citing *Hays*,

907 F.2d at 1457–58), *adopted by* 2011 WL 5599421 (E.D. Va. Nov. 17, 2011). An ALJ may

consider the ameliorating effects of medication in finding a claimant's symptoms to be not

disabling. *See Gross*, 785 F.2d at 1166. Here, the record contains some conflicting evidence

regarding the effectiveness of Lloyd S.'s medications. Lloyd S. points out deficiencies in some

of the ALJ's examples, and ALJ Owen cited other examples to support his finding that Lloyd S.

reported benefits and control of his symptoms from his medications throughout the relevant

period. The ALJ did not cherry-pick evidence, but properly weighed conflicting evidence, as it is

his responsibility to do, and the Court will not disturb his conclusions. *See Carr v. Berryhill*, No.

6:16cv10, 2017 WL 4127662, at *5 (W.D. Va. Sept. 18, 2017) ("The Court cannot simply look

at the same evidence and reverse the ALJ on the basis that it could have reached a different

result.").

Overall, ALJ Owen provided numerous reasons and relevant examples from the record to explain why he did not find Lloyd S. entirely credible. ALJ Owen's discussion "*both* identif[ied] evidence that support[ed] his conclusion *and* buil[t] an accurate and logical bridge from that evidence to his conclusion" that Lloyd S. was not as functionally limited as he alleged. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (internal quotations and brackets omitted). Thus, I find that ALJ Owen's credibility analysis is supported by substantial evidence.

B.      *Opinion Evidence*

Lloyd S. also argues that "[t]he ALJ erred in failing to give greater weight to the opinions of [his] treating providers," specifically Dr. Clements, Dr. Mahoney, and FNP Hodnett. Pl.'s Br. 14–15. The ALJ must weigh each "medical opinion" in the claimant's record. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Medical opinions are statements from "acceptable medical sources" that reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. *Id.* §§ 404.1527(a)(1), 416.927(a)(1). A treating physician's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ determines that the opinion is not entitled to controlling weight, then he must adequately explain the weight he afforded the opinion, taking into account all relevant factors, including the nature and extent of the physician's treatment relationship with the claimant; how well the physician explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the treating physician's opinion pertains to his or her area of specialty. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Radford v. Colvin*, 734 F.3d

288, 295–96 (4th Cir. 2013). Although treating physicians' medical opinions deserve deference, the ALJ may discount or reject such an opinion when there is "persuasive contrary evidence" in the record. *Mastro*, 270 F.3d at 178; *see Bishop*, 583 F. App'x at 67; *Hines*, 453 F.3d at 563 n.2.

Unlike Drs. Clements and Mahoney, FNP Hodnett is a non-acceptable medical source, and therefore her opinion does not constitute a "medical opinion" as that term is defined by the regulations. 20 C.F.R. §§ 404.1513(d)(1), 404.1527(a)(2) (2015); *see Ward v. Chater*, 924 F. Supp. 53, 56 (W.D. Va. 1996). That said,  non-acceptable medical sources can provide valuable information about the claimant's medical condition and functional limitations, and the ALJ must consider that information as he would any relevant evidence, *Adkins v. Colvin*, No. 4:13cv24, 2014 WL 3734331, at *3 (W.D. Va. July 28, 2014). Indeed, the ALJ may consider opinions from non-acceptable medical sources as he would opinions from acceptable medical sources, and he should do so when the source "had a lengthy relationship with the claimant." *Adkins*, 2014 WL 3734331, at *3 n.6 (quoting *Hall v. Colvin*, No. 7:12cv327, 2014 WL 988750, at *8 (W.D. Va. Mar. 13, 2014)). That is precisely what ALJ Owen did in this case. *See* R. 39–40.

ALJ Owen assigned little weight to Dr. Mahoney's opinion and little to no weight to Dr. Clements's opinion and FNP Hodnett's opinion. R. 38–40. Substantial evidence supports the ALJ's assessments, which often employed similar reasoning and thus will be analyzed together. First, ALJ Owen explained that both Dr. Mahoney and Dr. Clements rendered their opinions prior to the amended alleged onset date. Although this would not necessarily constitute a good reason by itself to discount a treating physician's opinion, the ALJ further explained that as to Dr. Clements, "there [were] no records in the current file to substantiate the limitations set forth" in his opinion. R. 38. As to Dr. Mahoney, his opinion was offered "prior to improvement of the claimant's condition according to his own treatment notes." *Id.* In other words, ALJ Owen found

that both opinions were either inconsistent with, or could not be confirmed by, the doctor's own

treatment notes concerning the relevant period of alleged disability.

This reason may provide a valid basis to discount a treating physician's opinion. *See*

*Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016) (explaining that "[w]hile the ALJ did not

cite specific pages in the record, his explanation relied on and identified a particular category of

evidence," in this case, the treating doctor's treatment notes). Lloyd S.'s complaints to Dr.

Mahoney regarding symptoms from his various impairments fluctuated, as did Dr. Mahoney's

findings on physical examination. *See generally supra* Pt. III.A. For example, on April 26, 2011,

Lloyd S. complained of chronic ankle pain and difficulty walking, but stated that he felt "85%

better" than before surgery, and Dr. Mahoney observed pain with range of motion, but no edema

on an ankle/foot examination. R. 417–18. On July 14, Lloyd S. reported "good general health"

and denied musculoskeletal issues on the review of systems, and a physical examination revealed

no abnormalities. R. 421–22. On May 16, 2012, Lloyd S. complained of upper arm and shoulder

pain on the left, but a physical examination was completely normal. R. 469–70. On June 29,

Lloyd S. still had shoulder and arm pain, and Dr. Mahoney noted tenderness and decreased

strength and range of motion in the shoulder. R. 466–68. On August 30, Lloyd S. reported

chronic neck pain and an MRI showed two bulging disks, but no nerve involvement, and

physical examination showed decreased range of motion in the neck and sensation in the left

hand, but normal reflexes. R. 463–64. As to Dr. Clements, his single post-surgery treatment note

did not set forth any abnormal findings, *see* R. 366–67 (indicating no right lower extremity

edema, slight left lower extremity edema over the calf above the ankle brace, and full range of

motion in the bilateral lower extremities), and indeed the ALJ noted that Lloyd S. reported to Dr.

Clements that he felt better following the procedure, R. 36 (citing R. 366–67). Thus, it was not

unreasonable for the ALJ to characterize "[t]hese notes, considered as a whole, . . . [as] inconsistent" with both Dr. Mahoney's and Dr. Clements's extremely restrictive opinions. *Sharp*, 660 F. App'x at 257.

Similarly, ALJ Owen explained that FNP Hodnett's opinion was not consistent with the objective evidence of record, including her treatment notes reflecting normal physical examinations. As with the evaluation of Dr. Mahoney's opinion, this reason provides a valid basis for discounting FNP Hodnett's opinion, and it is supported by substantial evidence. FNP Hodnett generally observed normal findings on physical examination, including normal gait, 4/5 strength in the bilateral upper extremities, no extremity edema, normal reflexes, and normal neurological examination. *See* R. 531, 534, 537, 540. ALJ Owen also found that FNP Hodnett's opinion that Lloyd S. "was medically required to use an assistive device for ambulation [was] not supported by the evidence, as even during her last visit with the claimant . . . [he] denied any dizziness, leg edema, syncope, fatigue, or gait abnormality, and she never indicated the claimant was required to use an assistive device." R. 39–40 (citing R. 539–41). The ALJ is correct that none of FNP Hodnett's notes acknowledge Lloyd S.'s use of a cane, let alone indicate a medical need for one. Moreover, FNP Hodnett consistently noted that Lloyd S. had a normal gait. R. 531, 534, 537. Thus, I find that the ALJ did not err in assigning little to no weight to FNP Hodnett's opinion given his overall finding that it was "not balanced or objective, and not supported by the objective evidence of record." R. 40.

Last, returning to Dr. Mahoney's and Dr. Clements's opinions, the ALJ concluded that both relied too heavily on Lloyd S.'s subjective complaints. The ALJ explained that Dr. Mahoney's opinion was "likely a restatement of the claimant's subjective . . . limitations and restrictions," which he found problematic because "good reasons [existed] for questioning the

22

reliability of the claimant's subjective complaints." R. 38. The ALJ made the same observation

regarding Dr. Clements's opinion. R. 38–39 ("[I]t appears the doctor relied quite heavily on the

subjective reports of symptoms and limitations provided by the claimant, and seemed to

uncritically accept as true most, if not all, of . . . what the claimant reported . . . ."). The ALJ is

permitted to question a physician's opinion that relies too heavily on a patient's report of

symptoms, especially where, as here, the ALJ found the patient in question less than credible.

*See Weaver v. Colvin*, No. 3:15cv26, 2016 WL 4768841, at *11 (W.D. Va. Sept. 13, 2016)

(citing *Morris v. Barnhart*, 78 F. App'x 820, 824 (3d Cir. 2003)). Furthermore, the ALJ

identified important qualifiers contained in Dr. Clements's opinion. R. 39. Notably, Dr. Clements

stated that he could not determine whether Lloyd S.'s complaints of pain were genuine; that the

pain would cause frequent interruptions in concentration and focus "*if the pain is as patient*

*describes*"; and that "*according to patient*," Lloyd S. would require opportunities to rest

throughout the day. R. 381 (emphasis added). Thus, as ALJ Owen recognized, R. 39, many of

the limitations identified in Dr. Clements's opinion were expressly predicated on acceptance of

Lloyd S.'s statements about his pain. R. 381. Because the ALJ found Lloyd S.'s statements not

fully credible compared to other relevant evidence in the record, he did not err in discounting the

medical opinions that depended on those statements.

    Lloyd S. nevertheless argues that all three opinions "are consistent with and supported by

the other evidence of record." Pl.'s Br. 16. He cites generally to the degenerative nature of his

impairments, references a treatment note predating the relevant period that shows decreased

range of motion in his ankles, *see* R. 377, and alludes to "consistent[] document[ation of] the

instability of" his ankles as support for this overarching proposition. Pl.'s Br. 16–17. Lloyd S.

also contends that other relevant factors that the ALJ did not consider, including the lengthy

treatment relationships the medical providers had with him, support their findings. Pl.'s Br. 18.
Finally, Lloyd S. identifies specific pieces of evidence he believes demonstrate the opinions'
consistency with the record. None of these arguments is persuasive.

First, as to the nature of his impairments, "[m]edical conditions alone do not entitle a
claimant to disability benefits; 'there must be a showing of related functional loss.'" *Felton-
Miller v. Astrue*, 459 F. App'x 226, 229–30 (4th Cir. 2011) (per curiam) (quoting *Gross*, 785
F.2d at 1166). Next, although the treatment note from October 22, 2010, does show a decreased
range of motion in the ankle, R. 377, and Dr. Humphries also identified some decreased ankle
range of motion during the consultative examination, R. 498, ALJ Owen identified records
documenting consistently benign physical examinations of the same impairment, and the Court
will not reweigh the evidence, *Davis v. Barnhart*, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005)
(citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)) ("[T]he Fourth Circuit has also
admonished that it is the role of the ALJ, and not reviewing courts, to resolve conflicts in the
evidence."). Additionally, Lloyd S. does not identify any specific treatment notes showing ankle
instability that the ALJ did not consider. *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th
Cir. 2014) ("Indeed, Reid has failed to point to *any* specific piece of evidence not considered by
the Commissioner that might have changed the outcome of his disability claim.").

Further, ALJ Owen did acknowledge that each source had a lengthy treatment
relationship with Lloyd S., R. 38–40, but he reasonably discounted their opinions for the reasons
explained above. That he did not explicitly consider every factor, or that these providers treated
Lloyd S. for the complained-of impairments, does not by itself show that the ALJ's analysis was
deficient. *See Reid*, 769 F.3d at 865 ("[T]here is no rigid requirement that the ALJ specifically
refer to every piece of evidence in his decision."); *Bishop*, 583 F. App'x at 67 ("While the ALJ

24

did not explicitly analyze each of the [regulatory] factors on the record, the ALJ was clear that he concluded that the doctor's opinion was not consistent with the record or supported by the medical evidence, which are appropriate reasons . . . . to reject the treating physician's opinion in its entirety."). Last, much of the "objective" evidence cited by Lloyd S. is in reality a recitation of his subjective complaints to providers. *See* Pl.'s Br. 19 (identifying use of cane, difficulty walking, and severe pain from the review of systems in December 2010 (R. 382), as well as complaints of burning left ankle pain in June 2011 (R. 415), moderate chronic pain and difficulty walking in April 2011 (R. 417), left ankle pain in October 2011 (R. 426), chronic pain in ankles and lower extremities in April 2012 (R. 471), and left ankle pain to FNP Hodnett in 2014 and 2015 (R. 539)). It is well-settled that a doctor does not convert subjective complaints into objective medical evidence merely by recording them. *See Craig*, 76 F.3d at 590 n.2. As to the actual objective evidence cited, *see* Pl.'s Br. 19 (decreased range of motion in the ankles in October 2010 (R. 377), April 2011 (R. 417), October 2011 (R. 426), and June 2013 (R. 498), as well as mildly antalgic gait in June 2013 (R. 501)), Lloyd S. is correct that these notes do show some abnormalities, but again, the ALJ cited many instances of normal objective findings, and the Court  cannot reweigh this conflicting evidence, *see Davis*, 392 F. Supp. 2d at 751.

Overall, then, ALJ Owen cited valid reasons supported by substantial evidence for discounting each of the three treating source opinions; thus, this Court cannot find that he erred in his evaluation. *See Dunn*, 607 F. App'x at 271 ("We must defer to the ALJ's assignments of weight unless they are not supported by substantial evidence.").

C.    *Remaining RFC Challenges*

Lloyd S.'s final argument contains specific challenges to the RFC determination. Pl.'s Br. 25. A claimant's RFC is the most he can do on a regular and continuing basis despite his

impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1. It is a

factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's]

record," *Felton-Miller*, 459 F. App'x at 230–31, and it must reflect the combined limiting effects

of impairments that are supported by the medical evidence or the claimant's credible complaints

of pain or other symptoms, *see Mascio*, 780 F.3d at 638–40. The ALJ's RFC assessment "must

include a narrative discussion describing" how specific medical facts and nonmedical evidence

"support[] each conclusion," *Mascio*, 780 F.3d at 636, and why he discounted any "obviously

probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259

(4th Cir. 1977); *see also Reid*, 769 F.3d at 865.

    First, Lloyd S. takes issue with the ALJ's characterization of his ability to walk and stand

for four hours as permitting "light work," which generally requires six hours of walking and

standing during an eight-hour workday. Pl.'s Br. 25. Lloyd S. contends that although the ALJ

gave great weight to the DDS physicians' opinions, he did "not note that the state agency

physicians stated that the maximum sustained work capability demonstrated by the[ir] RFC

findings . . . is the sedentary exertional level." *Id.* He faults the ALJ for posing a hypothetical to

the VE premised on a "limited range of light work" and for not explaining why he "rejected the

opinions of the state agency physicians" finding sedentary work. *Id.* at 25–26.

    These arguments have no merit. They focus on how the DDS physicians labeled their

overall conclusions that Lloyd S. was not disabled, rather than on the specific functional abilities

and limitations they identified. The ALJ's RFC determination is identical to the limitations

espoused by the DDS physicians. *See* R. 30, 118–20, 133–35, 149–53, 165–69. The ALJ

concluded, however, that these limitations established that Lloyd S. could do a reduced range of

light work, R. 30, whereas the DDS physicians viewed the restrictions as confining him to

sedentary work, R. 120, 135, 154, 170. The ALJ presented a hypothetical to the VE containing

the exact restrictions set out by the DDS physicians, and the VE testified that certain light

occupations existed in significant numbers in the national and local economies for an individual

with those limitations. R. 74–75 (identifying occupations available to a hypothetical person who

could perform "a limited range of light work that affords the worker the opportunity to sit and

stand"). Considering the amply supported RFC and the VE's testimony that Lloyd S. could

perform certain identified occupations categorized as light work, substantial evidence supports

the ALJ's RFC and concordant step-five determination, regardless of the legal label attached to

the specific exertional limitations identified in the RFC.

Proceeding on the assumption that his first argument would prevail and that his RFC

should have been categorized as "sedentary," Lloyd S. asserts that the ALJ "erroneously failed to

include any manipulative limitations in his RFC finding." Pl.'s Br. 26. In furtherance of this

position, Lloyd S. identifies the opinions of Dr. Mahoney and FNP Hodnett, both of whom stated

Lloyd S. had manipulative limitations. *Id.* Lloyd S. continues that "[i]f the ALJ had properly

found plaintiff is limited to the sedentary exertional level with manipulative limitations, the ALJ

would have found plaintiff disabled as per SSR 96-9p, sedentary work requires good use of both

arms and hands." *Id.* Because I find that ALJ Owen did not err in either 1) characterizing Lloyd

S.'s RFC as permitting light work, or 2) evaluating Dr. Mahoney's and FNP Hodnett's opinions,[7]

this argument is based on an unfounded premise and therefore fails.

---

[7] Lloyd S. does not elaborate as to why he believes the ALJ's decision is insufficient regarding the
evaluation of this aspect of Dr. Mahoney's and FNP Hodnett's opinions, but rather bases the challenge on
the assumption that the ALJ erred in assigning the opinions little weight overall. ALJ Owen's discussion,
however, adequately addressed the entirety of each opinion, including the manipulative limitations. As to
FNP Hodnett, the ALJ explained that her opinion was inconsistent with her treatment notes, which
revealed normal physical findings. R. 39. This reasoning extends to the opined manipulative limitations of
limited handling and fingering. FNP Hodnett indicated that these limitations were based on the existence
of a fine tremor, yet she explained that no fine tremor was present and range of motion of the fingers was

Last, Lloyd S. contends that the ALJ failed to conduct a function-by-function analysis. Pl.'s Br. 26–27. Specifically, he asserts that the ALJ "failed to make any specific findings regarding his manipulative limitations, his need to lie down and rest during the day, [and] the frequency he would be absent from work and consequently, did not present proper hypotheticals to the vocational expert." *Id.* at 26. The only evidence in the record supporting these alleged limitations comes either from Lloyd S.'s statements about his limitations or Dr. Mahoney's and FNP Hodnett's opinions. Substantial evidence supports the ALJ's assessments pertaining to their opinions and the credibility of Plaintiff's report of symptoms. Implicit in the ALJ's discussion of Lloyd S.'s ability to walk, stand, and sit during an eight-hour workday is his rejection of more restrictive limitations proposed by Lloyd S. and his healthcare providers. Therefore, I cannot find that the ALJ erred in not making more specific findings. Put another way, ALJ Owen provided a sufficient explanation, supported by substantial evidence, for his RFC finding, thus satisfying his obligation to provide a function-by-function analysis. That he did not make a specific finding on every one of Lloyd S.'s allegations does not alter that outcome, and therefore, I cannot find that this challenge merits remand.

## V. Conclusion

---

within defined limits on examination conducted the day she completed her assessment. R. 604. During oral argument, Lloyd S.'s counsel conceded that there was no further support for this limitation other than the diagnosis of a fine tremor. As to Dr. Mahoney, he concluded that Lloyd S. could not use his hands for pushing and pulling or repetitive motion, but could use them for simple grasping and fine manipulation, although he did not explain the source for these limitations. R. 606. During oral argument, Lloyd S.'s counsel identified Dr. Mahoney's treatment notes of mildly decreased strength and range of motion in the shoulder, cervical spine imaging, and decreased sensation in the left hand as support for his opinion. *See* R. 464, 466–67. The findings in two treatment notes of mild or unspecified reductions in strength or range of motion, when compared to the absence of any abnormal findings related to these conditions in the rest of the record, do not undermine the ALJ's finding that Dr. Mahoney's opinions were inconsistent with his treatment notes for the relevant period. R. 38. To find that this evidence supports Dr. Mahoney's inclusion of manipulative limitations would constitute impermissible reweighing of the evidence.

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **DENY** the Plaintiff's Motion for Summary Judgment, ECF No. 17, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 21, **AFFIRM** the Commissioner's final decision, and **DISMISS** the case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: July 20, 2018

Joel C. Hoppe
United States Magistrate Judge

29